**Guy Wayne NICHOLS,**
**Plaintiff/Appellant,**

v.

**Melissa Renee RALSTON, Defendant,**

**and**

**Kari Lynn Schulze,**
**Defendant/Respondent.**

**No. 20306.**

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 23, 1996.

---

Stephen P. Carlton, Carlton & Mayo, P.C., Carthage, for plaintiff/appellant.

Sarah Luce Reeder, Joplin, for defendant/respondent.

CROW, Presiding Judge.

This is a dispute between the parents of Melissa Renee Ralston about custody and visitation. For brevity and clarity, we refer to Melissa's mother, Kari Lynn Schulze (nee Ralston) as Mother, and to Melissa's father, Guy Wayne Nichols, as Father.

This is the second time a dispute between Mother and Father about Melissa has been to this court. The first occasion was *Nichols v. Ralston,* 825 S.W.2d 347 (Mo.App. S.D. 1992). We henceforth refer to it as *Nichols–I.* It should be read as a preface to the present opinion.

In *Nichols–I,* an appeal by Mother, this court affirmed a judgment entered May 6, 1991, granting Mother "[c]are and custody" of Melissa and awarding Father:

"... reasonable visitation and specifically every other weekend from 5:00 p.m. Friday to 5:00 p.m. Sunday beginning April 19, 1991; Christmas Day, Memorial Day weekend, and Labor Day weekend in odd numbered years; Christmas Eve, Easter, July 4th and Thanksgiving in even numbered years; July 1 through July 15 and Father's Day of each year."

We henceforth refer to the judgment affirmed by this court in *Nichols–I* as "the 1991 judgment."

After *Nichols–I,* an armistice existed until Mother filed a motion to modify on December 29, 1994. An ensuing trial on May 10, 1995, resulted in a judgment providing that Father's contact with Melissa shall be limited to "supervised visitation" as follows:

"Visitation ... shall take place within the [presence] of [Mother] or if she so elects with Christie Burger. Supervised visitation shall take place on the following days:

Every first, third and fifth, if applicable, Saturday of each month, unless the parties agree on the Sunday following such Saturday, from 9:30 a.m. to 7:30 p.m. and on Christmas Day, Memorial Day weekend, on either Monday, unless the parties can agree on the Saturday or Sunday of Memorial Day weekend and similarly on Labor Day weekend, from 1:00 p.m. to 7:30 p.m. in odd numbered years and in even

numbered years Christmas Eve, Easter Sunday, unless the parties can agree on Saturday, July 4th and Thanksgiving from 1:00 p.m. to 7:30 p.m.

The Court further orders that no visitation shall occur or continue to occur if the [Father] consume [sic] alcoholic beverages prior to his exercising visitation, that day or if he consume [sic] any alcoholic [beverages] during the time of visitation.

The Court further order [sic] that so long as [Father's] visitation is to be supervised, he is not to operate a motor vehicle while ... Melissa ... is in such motor vehicle."

We henceforth refer to the above judgment as "the 1995 judgment."

Father brings the present appeal from the 1995 judgment. His sole point relied on maintains the trial court erred by requiring supervised visitation in that the evidence "did not establish a substantial change of circumstance from the [1991] judgement." Father's brief tells us the statute "which appears to be relevant" is § 452.400.2, RSMo 1994. It reads:

"The court may modify an order granting or denying visitation rights whenever modification would serve the best interests of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger the child's physical health or impair his emotional development. When a court restricts a parent's visitation rights or when a court orders supervised visitation because of allegations of abuse or domestic violence, a showing of proof of treatment and rehabilitation shall be made to the court before unsupervised visitation may be ordered. 'Supervised visitation', as used in this section, is visitation which takes place in the presence of a responsible adult appointed by the court for the protection of the child."

Inasmuch as the above statute says nothing about a change of circumstances, Father's contention that the evidence was insufficient to demonstrate "a substantial change of circumstance" appears to be irrelevant. However, another statute does require a change in circumstances as a condition precedent to modification of a "prior custody de-

cree." That statute, § 452.410.1, RSMo 1994, reads:

"... the court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child...."

Because § 452.400.2 governs modification of *visitation rights,* and § 452.410.1 governs modification of a *custody decree,* we must, in identifying the statute that applies in the present appeal, ascertain whether the right granted Father to keep Melissa during the periods specified in the 1991 judgment was an award of custody or an award of visitation rights.

In seeking the answer, we find this in § 452.375.1(2), RSMo 1994:

" 'Joint physical custody' means an order awarding each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents."

We find no statutory definition of "visitation rights." However, § 452.400.1, RSMo 1994, refers to a parent who is "not granted custody of the child" as a "noncustodial" parent.

■ As we have seen, the 1991 judgment allowed Father to keep Melissa on alternate weekends for 48 consecutive hours. It also allowed him to keep her 15 consecutive days once each summer. In addition, the 1991 judgment allowed Father to have Melissa with him on other occasions, alternating between even numbered and odd numbered years. According to our reckoning, the 1991 judgment placed Melissa under Father's care and supervision almost 20 percent of each year.

In *Nix v. Nix,* 862 S.W.2d 948, 951 (Mo. App. S.D.1993), this court concluded that a similar arrangement regarding physical custody of a child constituted joint physical custody as defined in § 452.375.1(2), RSMo

Cum.Supp.1990.[1] Consistent with *Nix*, we hold the 1991 judgment granted Father and Mother joint physical custody of Melissa, with Mother having physical custody approximately 80 percent of the time and Father having physical custody approximately 20 percent of the time.

The 1995 judgment reduces Father's time with Melissa to a ten-hour period twice a month (or in some instances thrice a month[2]) plus a six-and-a-half-hour period on a few designated days alternating between even numbered and odd numbered years. Under the 1995 judgment, Melissa is never with Father overnight. Consequently, Father no longer has any significant period of time during which Melissa resides with him or is under his care and supervision.

■ Applying the definition of joint physical custody in § 452.375.1(2), we hold the 1995 judgment terminates joint physical custody of Melissa and places her in the sole physical custody of Mother, leaving Father only supervised visitation. Because of that drastic modification, we hold the evidence in support of the 1995 judgment had to satisfy § 452.410.1 (quoted *supra*).

■ The change in circumstances required by § 452.410.1 must be in the circumstances of the child or his custodian. *Moore v. Moore*, 849 S.W.2d 652, 655[3] (Mo.App. W.D.1993). However, because Father and Mother had joint physical custody of Melissa under the 1991 judgment, each parent was a custodian within the meaning of § 452.410.1. *Cf. Clark v. Clark*, 805 S.W.2d 290, 294[2] (Mo.App. E.D.1991).

The 1995 judgment mentions no change in Mother's circumstances. The 1995 judgment states its modification of the 1991 judgment is based on:

"... [Father's] continuing instances of alcohol abuse and consumption. [Father's] disregard for the Laws of Missouri and his violence and mood changes when he consumes alcohol. [Father's] lack of regard for proper supervision of ... Melissa ... while in his care. As well as the lack of proper house hold [sic] sanitary conditions evidence [sic] by frequency with which the child has returned to the primary custodian house of the mother with head lice."

■ In reviewing Father's claim that the evidence was insufficient to establish a substantial change in circumstances since the 1991 judgment, we accept as true the evidence and inferences from it favorable to the 1995 judgment and disregard all contrary evidence. *Clark*, 805 S.W.2d at 291, *citing T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[2] (Mo. banc 1989). We must affirm the 1995 judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Clark*, 805 S.W.2d at 291, *citing Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976).

Melissa, born April 15, 1988, was in the first grade at time of trial.

In addition to Melissa, Father has another daughter, Amber. She was eleven years old at time of trial. Father testified Amber "was born ... of a marriage." Father has physical custody of Amber from June 1 until September 1 each year, plus "every other weekend." Father coordinated his alternate weekend custody of Amber with his ex-wife so Amber and Melissa were with him on the same weekends.

Viewed favorably to the trial court's finding regarding Father's "alcohol abuse and consumption" and the trial court's finding regarding Father's disregard for Missouri laws, the evidence established that Father was convicted November 18, 1994, of driving while intoxicated and sentenced to sixty days in jail. He was simultaneously convicted of assault of a law enforcement officer in the third degree. According to Father, both crimes occurred in the same incident. Although the record is imprecise, we infer the sixty-day sentence was for both crimes and that Father was paroled after serving approximately half the sentence. Father's driver's license was revoked as a result of the

---

1. Section 452.375.1(2), RSMo Cum.Supp.1990, was carried forward unchanged in RSMo 1994.

2. Four months in 1996 have five Saturdays.

incident. He intended to apply for reinstatement in June, 1995.

Additional evidence of Father's affinity for alcohol came from the testimony of Mother and her sister, Kristy Buerge.[3]

Mother avowed she knew Father drank when Melissa was with him. Mother explained: "I have picked her up and he has had alcohol on his breath.... I could tell by the look in his eyes.... And I could smell the alcohol on him." According to Mother, the last such instance was two months before trial.

Kristy Buerge testified her husband, Leonard, is a friend of Father; they work for the same employer. After Father lost his driver's license, Leonard drove Father to work on Saturdays. Ms. Buerge recounted that one Saturday in March, 1995, Leonard brought Father to the Buerge home around 4:30 p.m., after work. Melissa and Amber were with them. According to Ms. Buerge, Leonard and Father each had a quart of beer; each was drinking. Melissa and Amber played while Leonard and Father drank. After dinner, Father fell asleep about 8:30. As planned, Father, Melissa and Amber spent the night there (Father had brought a change of clothing for them). The next afternoon, Leonard drove Father, Melissa and Amber to Father's home.

Leonard Buerge testified that after work on Saturdays he has driven himself and Father to a liquor store so each could get a quart of beer. When Melissa and Amber were with them, Melissa and Amber would get "soda pop." In the month preceding trial, Leonard saw Father drink in Melissa's presence on two or three occasions. Leonard also saw Father "drink and drive" during that time, but never when Melissa was with him. Leonard recalled three or four occasions when Father drove after losing his driver's license; Leonard also remembered instances when Father drank and drove before losing his license.

Father admitted that during the two years preceding trial there were two or three occasions when he drove an automobile while drinking beer and Melissa was a passenger.

Evidence pertinent to the trial court's finding regarding Father's "violence and mood changes when he consumes alcohol" was relatively brief. As reported earlier, Father was convicted of assault on the officer who arrested him for driving while intoxicated. In addition to that, Mother testified: "I have known [Father] to have very short temper. He will lose his temper very easily. If anyone walks up behind him, he will jump and swing." Mother conceded there were no other characteristics of Father's "moral conduct" that concerned her.

The only other evidence regarding "violence" was an incident described by Ms. Buerge:

"[Father] was standing at the stove talking to me and Melissa had walked up behind him and—and it scared him and jumped him. He turned around and swung and she had on like this cross necklace and it flipped that and popped her in the mouth.... She started crying and then he started talking to her to try to get her to calm down. And then she was okay after that."

Asked what Father said to Melissa, Ms. Buerge replied, "Just that he was sorry and that she should know not to walk up behind him like that because she knew that he was jumpy."

In regard to the trial court's finding that Father demonstrated "lack of regard for proper supervision" of Melissa, the evidence showed Father allowed Melissa and Amber to play, unsupervised, in a municipal park across the street from his house. Mother worried about the danger of abduction. Mother testified she told Melissa not to go there without Father, and to the best of Mother's knowledge Melissa had not done so since the warning.

The only other evidence regarding lack of supervision came from Ms. Buerge. She de-

---

**3.** The segment of the 1995 judgment quoted earlier designates "Christie Burger" as a person who, at Mother's option, is authorized to supervise Father's visitation with Melissa. Because "Christie Burger" is unmentioned in the evidence, we suspect she and "Kristy Buerge" are the same person.

scribed an incident one Saturday when she telephoned Father's house to see whether Leonard was there. Amber and Melissa were there alone. Melissa told Ms. Buerge that Father "went up the road to John's house."

Father admitted the incident, explaining that a disabled man lived 300 feet away and Father was helping him move. Father estimated Melissa and Amber were alone about thirty minutes. That was consistent with Ms. Buerge's testimony.

Evidence supporting the trial court's finding regarding Melissa's head lice came from Mother. She testified Melissa had been returning from her weekends with Father "with head lice a lot." Asked whether she confronted Father about it, Mother answered, "Yes." She added: "[L]ast year the only way it was settled was I'd notified the Social Services and they stepped in to make sure that it was taken care of. And they have been notified this time, too.... [Father] said he would take care of the problem, but the following weekend she came home with it again."

Father conceded a social worker contacted him about the lice a week before trial and he had made no attempt to "treat" his home.

The only other evidence regarding lack of sanitary conditions at Father's home was Mother's testimony that Melissa has returned from weekends with Father looking as if "she had not had a bath." Mother described Melissa as looking "like a child would look ... that had been ... playing around in the dirt."

We share the trial court's obvious concern about Melissa's safety and hygiene when she is with Father. However, the record demonstrates little, if any, change in Father's circumstances since the 1991 judgment. The opinion in *Nichols–I* lists several offenses—including alcohol-related traffic offenses—of which Father had been convicted prior to the 1991 judgment. 825 S.W.2d at 348. The

opinion in *Nichols–I* notes Father drinks excessively on weekends and drove a motor vehicle while intoxicated with Melissa as a passenger. *Id.*

This court, in a two-to-one decision, affirmed the 1991 judgment in *Nichols–I*.[4] That holding, wise or not, became the law of the case. *See: In re Marriage of Quintard,* 735 S.W.2d 388, 390[1] (Mo.App. S.D.1987).

■ During the four years between the 1991 judgment and the 1995 judgment, Father's criminal record increased by only two convictions, one driving while intoxicated and one assault on a law enforcement officer. Given his already woeful record, those two convictions do not demonstrate a change in circumstances. They are consistent with his behavior noted in *Nichols–I*.

Father is an enigma. As explained in *Nichols–I*, Father asked to be judicially declared the father of Melissa.[5] 825 S.W.2d at 348. The trial court granted Father's prayer and ordered him to pay child support. *Id.* In her testimony at the 1995 trial, Mother acknowledged Father had made every payment.

Furthermore, there was uncontradicted evidence that Father has lived in the same house ten years—the house where Mother once cohabited with him. Father has held the same job eleven and a half years and, according to him, has never missed work because of intoxication. As reported earlier, he has physical custody of his elder daughter, Amber, three consecutive months each year plus alternate weekends.

Interviewed by the trial court, Melissa revealed she does not like it when Father drinks beer because Leonard drinks also and she thinks "they're going to have a wreck." Melissa disclosed Father has drunk beer and driven with her in the car; that scared her. Melissa also told the trial court that Father acts "meaner" when he drinks.

4. The author of the present opinion dissented in *Nichols–I.* 825 S.W.2d at 349. The author found no substantial evidence to support a conclusion that it was in Melissa's best interest to be in Father's custody forty-eight consecutive hours every other weekend. *Id.*

5. The 1991 judgment changed Melissa's name from Melissa Renee Ralston to Melissa Renee Ralston–Nichols. However, the 1995 judgment inexplicably refers to her as Melissa Renee Ralston. To avoid confusion, we identified her by that name in the first sentence of this opinion.

During her weekends in Father's custody, Melissa was cared for by a baby-sitter while Father was at work on Saturdays. Melissa confirmed Father left her and Amber alone on the occasion described by Ms. Buerge, but Melissa assured the trial court that was the only time.

Melissa and Amber have a bedroom at Father's house. There is a dresser beside the bed and they have toys "and a thing to put our stuff on." Melissa and Amber watch cartoons, play video games, and go to the park—accompanied by Father.

Asked where they eat, Melissa replied that Father frequently cooked steak, green beans and corn. However, she likes to go to McDonald's, which they sometimes do. Melissa takes a bath at Father's house most weekends she is with him. She likes to play outside, so she gets dirty.

Father has a sister who, like him, resides in Carthage. We glean from the record that the sister, Lela, is married and has two children. On holidays and some other occasions, Father, Melissa and Amber spend time with Lela and her family.

A guardian ad litem appointed for Melissa by the trial court recommended no change in the 1991 judgment except addition of a proviso that Father not consume alcohol in Melissa's presence. The guardian had visited Father's house and observed it needed attention. However, the guardian explained that Father's mother died two weeks before trial and Father had "a bunch of [her] belongings over there." The guardian believed Father could clean the house and eradicate the lice.

■ Mindful that an appellate court should not disturb a trial court's custody order unless firmly convinced that the order is manifestly erroneous and the welfare of the child requires some other disposition, *In re Marriage of Campbell*, 868 S.W.2d 148, 150[2] (Mo.App. S.D.1993), we nonetheless hold the trial court erred in the sweeping changes it made to the 1991 judgment. In a praiseworthy effort to ensure that Melissa was protected from Father's drinking and the substandard sanitation of his house, the trial court extinguished Father's physical custody of Melissa, replacing it with short and infrequent periods of supervised visitation.

Viewed favorably to Mother in every respect, the evidence was insufficient to establish any significant change in the circumstances of Father since the 1991 judgment. He is not an award-winner, but he has changed little, if any, since *Nichols–I*. Melissa, other than being older, has undergone no change in circumstances. Mother has married since the 1991 judgment and has two children by that marriage; however, those changes played no role in the trial court's modification of the 1991 judgment. *Cf. Betterton v. Betterton*, 752 S.W.2d 417, 419 (Mo. App. W.D.1988). Indeed, the only noteworthy change in this perplexing case since *Nichols–I* is that a different judge heard the 1995 evidence.

■ In sum, there is no change in circumstances warranting termination of the physical custody rights granted Father in the 1991 judgment. However, that does not mean the courts are powerless to protect Melissa from Father's drinking and the lice she encounters in his house.

Father testified he had no objection to an order forbidding him from consuming intoxicants in Melissa's presence. Such an order is amply justified by the record and should be even broader. Father should be barred from drinking any alcoholic beverage on any day he has custody of Melissa, the only exception being that on days when Father returns Melissa to Mother, he may drink after the return.

Furthermore, inasmuch as the record shows Father has driven an automobile while drinking (inferably even after losing his driver's license), the trial court would be fully justified in prohibiting Father from driving an automobile with Melissa as a passenger, even if Father has regained his license. Such an order would apparently create no major obstacle in the transfer of custody from Mother to Father at the designated times. As we understand the testimony, the transfer site is the Carthage police station, which is "not a long walk" from Father's house. On remand, the trial court can hear evidence regarding Father's driving status

and determine whether such an order is necessary for Melissa's safety.

If Father disobeys any order the trial court enters pursuant to the two preceding paragraphs, the trial court may, in its discretion, modify Father's custody rights in whatever way the trial court finds reasonably necessary to serve Melissa's best interest. Modification would also be justified if Melissa continues to get head lice while in Father's custody.

The portions of the 1995 judgment modifying the 1991 judgment are reversed and the case is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the 1995 judgment is affirmed.[6] Costs of this appeal are taxed half against Father and half against Mother.

MONTGOMERY, C.J., and PARRISH, J., concur.

---

**6.** The 1995 judgment contains provisions regarding the guardian ad litem fee, attorney fees and costs. Those provisions are unchallenged in this appeal.